NOT DESIGNATED FOR PUBLICATION

No. 123,199

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of I.J.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Geary District Court; COURTNEY D. BOEHM, judge. Opinion filed March 19, 2021. Affirmed.

*Anita Settle Kemp*, of Wichita, for appellant natural mother.

*Michelle L. Brown*, assistant county attorney, for appellee.

Before POWELL, P.J., GREEN and HILL, JJ.

PER CURIAM: The sad truth is that drug abuse often harms people other than the drug user. This is such a case. Mother's drug abuse meant that her baby would be living in a foster home and she would be living behind bars. Because Mother used methamphetamine while pregnant, I.J., the subject of this child in need of care case, was born with methamphetamine in the child's system. Then, after birth the child suffered withdrawal symptoms from the drugs. I.J. has remained in foster care since birth. Meanwhile, Mother, the appellant, has been incarcerated either in jail or in prison the entire time the child has been alive.

1

Mother appeals the termination of her parental rights to her child, contending the court erred when it found her unfit to parent and that her unfitness was unlikely to change in the foreseeable future. We find no error in this record and affirm.

*Officers seek Mother for violating her probation.*

On August 1, 2018, officers checked on Mother at a residence in Junction City. She

- was nine months pregnant;
- was on probation;
- had tested positive for marijuana, cocaine, and methamphetamine during her pregnancy; and
- had outstanding felony warrants for her arrest.

When Captain Patricia Giordano approached Mother in her bedroom, Mother said she had not smoked methamphetamine for six days and she did not want to go to jail. Officers searched Mother's residence and located a glass pipe that contained methamphetamine residue and a baggie that contained cocaine.

The captain noticed Mother's ankles were very swollen and told her she needed to go the hospital to be evaluated. Mother gave birth to I.J. in the hospital later that day. I.J. positive for methamphetamine and began going through withdrawal symptoms.

After Mother gave birth, Captain Giordano arrested Mother on the charge of child endangerment for using methamphetamine while pregnant. I.J. was placed in protective custody and later adjudicated to be a child in need of care.

*Mother goes to prison, and I.J. remains a ward of the court.*

For the charge of using drugs while pregnant, Mother pled no contest to aggravated child endangerment. And to resolve some earlier charges, Mother pled no contest to possession of cocaine. In addition, her probation was revoked in a prior case involving convictions for trafficking in contraband (hydrocodone) in a correctional institution, possession of cocaine, and endangering a child. In total, Mother received a 35-month prison sentence.

*Mother testified about her progress while in prison.*

Mother has done well in prison. While incarcerated, Mother completed several classes in the areas of domestic violence, parenting, strengthening families, and cognitive behavior. She attended NA meetings and was in a substance abuse program. She remained sober and abstained from drug use since before I.J. was born. Mother had diagnoses of PTSD, bipolar disorder, and anxiety. She was on medication and attending mental health counseling and therapy in prison.

About a year after I.J. was born, the State moved to terminate Mother's parental rights. At the time of the severance hearing, Mother had five months remaining on her prison sentence. I.J. was 15 months old. He was thriving and had been in the same foster placement for the past 10 months.

Mother's case manager testified that to be reintegrated with I.J., Mother would need to maintain a home, provide for I.J., attend NA meetings, maintain her sobriety, and complete a mental health intake. The case manager could not give an estimate on how long it would take, but she said it would take "a while."

Mother testified candidly about her personal history of drug abuse and criminal convictions. She started using marijuana when she was 14 years old. She had a cocaine

habit at age 20. She had been to rehab before. She had a prior conviction for distribution of cocaine in Colorado. Her last job was in 2017.

But she was hopeful for the future. Mother testified that she had made plans for when she was released from prison. She had been accepted into three sobriety homes for mothers with children. She would go to NA classes and submit to drug testing as part of living in a sobriety home. Her pastor planned to pay her first month's rent. She had jobs lined up at a meat-packing plant and a moving company. To her credit, Mother successfully completed residential treatment at the Women's Recovery Center in Wichita while in custody pending resolution of her criminal cases.

At the time of the termination hearing, Mother did not have any family in Kansas. She has five other children—ages three, and 13 through16, all of whom live with their fathers in Colorado. She had voluntarily placed them with their fathers after getting into trouble in Kansas. Before being incarcerated, she would visit them. She testified she maintained a relationship with them, calling every day.

Mother wanted to start supervised in-person visits with I.J. right away while in prison. She had a Skype visit with I.J. that went well a week before the hearing. She sent a card once.

The guardian ad litem argued that it was not in I.J.'s best interests to wait longer for permanency.

Time was an important factor for the district court in deciding to terminate Mother's parental rights. The court found Mother was unfit under K.S.A. 2019 Supp. 38-2269(b)(1)-(5) by reason of mental illness and substance abuse that rendered her unable to care for I.J.'s needs. Her use of illegal drugs while pregnant was both abusive in nature

4

and was physical abuse of I.J. She had been convicted of a felony and was in prison. And the court considered her long history of substance abuse and incarceration.

The court found reintegration was impossible in the foreseeable future because Mother would need to show stability for a long period of time including refraining from drug use, obtaining a mental health treatment, and establishing a stable and safe home for I.J. Nothing in the record suggests when such desirable events would occur. Mother's case manager testified that it would take "a while." The court found it was not in the best interests of I.J. to delay permanency for such an indeterminable period.

To us, Mother argues the district court's findings that she was unfit and that her unfitness was unlikely to change in the foreseeable future were not supported by clear and convincing evidence.

*The rules that guide us are well established.*

The Legislature has enacted a system of laws that ensure that such important questions as the termination of parental rights are decided as fairly as possible. A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to decide on the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the custody, care, and control of the child, the parent is entitled to due process of law. *In re Adoption of A.A.T.*, 287 Kan. 590, 600-01, 196 P.3d 1180 (2008).

When a child has been adjudicated to be a child in need of care, a court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2019 Supp. 38-2269(a).

That statute also lists nonexclusive factors a court shall consider in determining unfitness. K.S.A. 2019 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2019 Supp. 38-2269(c). Any one of the factors in K.S.A. 2019 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2019 Supp. 38-2269(f).

Upon making a finding of unfitness, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2019 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2019 Supp. 38-2269(g)(1).

On appeal, we review a district court's termination of parental rights and "'consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated."' *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019). In reviewing a district court's decision based on any clear and convincing evidence standard, an "appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

*We review Mother's arguments and the record.*

Despite being convicted of aggravated child endangerment, Mother argues that drug use during pregnancy is not "abusive [in] nature" or "physical . . . abuse" under K.S.A. 2019 Supp. 38-2269(b)(2), We need not decide this question because the Legislature has made it clear that K.S.A. 2019 Supp. 38-2269(b) is not an exclusive list

of factors the district court may consider. That fine legal point is insignificant given this record.

There is no question that Mother was, at the time of the termination hearing, unfit because she was in prison for multiple felonies. See K.S.A. 2019 Supp. 38-2269(b)(5). And this court has held in *In re M.B.*, 39 Kan. App. 2d 31, 46-47, 176 P.3d 977 (2008), that "because incarceration is one of the express factors to be considered by the court . . . incarceration alone could be sufficient evidence to support a conclusion of unfitness." Simply put, Mother could not care for I.J. while in prison.

And Mother has a long history of drug abuse and mental health issues that the district court found rendered her now unable to care for her child. See K.S.A. 2019 Supp. 38-2269(b)(1), (3). Those findings were supported by clear and convincing evidence at the termination hearing, including Mother's own testimony. Mother used marijuana, cocaine, and methamphetamine during her pregnancy. Though she was not using drugs and was getting mental health treatment in prison, Mother had not shown that she could maintain a stable drug-free home outside the structured environment of rehab and prison. She had a long history of substance abuse and criminal offenses including endangering a different child. Mother had not completed a mental health assessment to evaluate how those concerns would affect her parenting. Her case manager testified she could not be immediately reintegrated with I.J. once she left prison because of all those concerns. That testimony was undisputed. Mother was unfit.

The question here is whether Mother would remain unfit in the foreseeable future. Mother would likely be released from prison five months after the termination hearing. She argues that though I.J. was too young to establish a relationship with her, she took every available opportunity to address her addiction and mental health issues and to learn new parenting skills while in prison. She argues she could be reunited with I.J. in the foreseeable future. Mother could provide the court with no evidence about when she

7

could provide a home for her child and be able to fulfill her role as mother. Neither could any of the other witnesses. How long would it take, if ever? How long should a court wait in deciding that time is up?

There is no set amount of time that constitutes the "foreseeable future." Kansas measures the foreseeable future from the perspective of a child. K.S.A. 2019 Supp. 38-2201(b)(4). Children and adults have different perceptions of time. Children have the right to permanency in a timeframe reasonable to them. For children, a month or a year seems considerably longer than it would for an adult. The court may look to a parent's past conduct as indicative of future behavior. *In re K.L.B.*, 56 Kan. App. 2d 429, 446-47, 431 P.3d 883 (2018). Past cases provide us with some examples for comparison.

Imprisonment of a parent may justify termination of parental rights when:
- The parent has been incarcerated most of the child's life;
- the incarceration has impeded the development of a relationship between the parent and child; and
- delaying the proceedings to give the parent time to complete his or her prison sentence and to show sobriety, stable housing, and employment outside prison would not serve the best interests of the child.

See *In re K.L.B.*, 56 Kan. App. 2d at 447-48; *In re M.H.*, 50 Kan. App. 2d 1162, 1172, 337 P.3d 711 (2014).

In one case, this court found a father's incarceration for another seven months exceeded the foreseeable future when he had been incarcerated for a substantial portion of the children's lives and he had made almost no effort to establish or maintain a relationship with the children during his incarceration. *In re M.B.*, 39 Kan. App. 2d 31, 47-48, 176 P.3d 977 (2008). In another case, to determine a mother would not be fit in the foreseeable future, this court considered a case manager's testimony that after leaving court-ordered rehab, the mother would need to maintain sobriety, housing, and

employment for a period of time before reintegration was possible. *In re K.L.B.*, 56 Kan. App. 2d at 447.

Here, Mother had been incarcerated for all of I.J.'s life. There was sparse evidence of a relationship between I.J. and Mother. This was largely because I.J. was only 15 months old at the time of the termination hearing, precluding meaningful communication. The only evidence of how long this process of rehabilitation would take was the case manager's speculation that it would take "a while." Thus, the court was confronted with the very important question of how long "a while" should I.J. wait?

While Mother has taken many positive steps forward, she has been limited by her circumstances. We recognize that those circumstances were caused by Mother's numerous criminal activities while she was pregnant with I.J.

Considering Mother's lengthy historical pattern of substance abuse and incarceration, the district court found:

> "I understand the release from DOC is going to be in April. But there would have to be an extended period of time to show stability because of the history of the substance abuse, the need for mental health treatment, the need to establish a stable and safe home for [I.J.]. And the Court doesn't believe it's in [the child's] best interest[s] to delay permanency for such a significant period of time. [the child has] already been in . . . out-of-home custody for over 12 months, 15 months since [the child's] birth."

The court considered the passage of time from I.J.'s perspective. This perspective is what the statutes and caselaw compel a court to use.

We conclude that a rational fact-finder could have found it highly probable that Mother would not be fit in the foreseeable future and that delaying permanency would not be in I.J.'s best interests.

9

Affirmed.